[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13427

_____

D.C. Docket No. 9:10-cr-80159-KAM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BRIAN MICKO YEARY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 22, 2014)

Before TJOFLAT, MARTIN, and FAY, Circuit Judges.

TJOFLAT, Circuit Judge:

A federal jury convicted Brian Micko Yeary, a felon, on multiple counts of

conspiring to possess, or of possessing, various controlled substances with intent to

distribute, of possessing a firearm in furtherance of a drug trafficking offense, and of possessing a firearm or ammunition by a felon.[1] The District Court sentenced him to prison for a total of 1,092 months.[2] Yeary now appeals his convictions and sentences. He challenges his convictions on five grounds and his sentences on one ground. The only challenges meriting discussion deal with his convictions; he argues that the District Court erred in denying his motion to suppress evidence— drugs, drug paraphernalia, and firearms—that the police seized in warrantless searches of his residences. The other challenges are meritless, as indicated in the footnote below.[3] At the end of the day, we affirm Yeary's convictions and sentences.

---

[1] The case was tried on a second superseding indictment. The jury found Yeary guilty of three counts of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (2006) (Counts 1, 5, and 9); possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) (Count 2); conspiracy to possess with intent to distribute over 500 grams of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count 14); conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count 16); four counts of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts 3, 7, 15, and 17); and five counts of possession of a firearm or ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts 4, 8, 11, 12, and 13). The jury acquitted Yeary on one count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count 6), and one count of possession of oxycodone with intent to distribute (Count 10), in violation of 21 U.S.C. § 841(a)(1).

[2] The District Court sentenced Yeary to concurrent prison terms as follows: 132 months on Counts 1, 5, 9, 14 and 16; 60 months on Counts 2, 4, 8, 11, 12 and 13. The court sentenced him to consecutive prison terms of 60 months on Count 3, and 300 months on Counts 7, 15 and 17.

[3] Yeary seeks an acquittal on all charges, arguing that the evidence was insufficient to convict. This argument lacks merit because the evidence of guilt was overwhelming. He seeks a

2

I.

In this part, we detail the facts the Government's proof established at Yeary's trial.  Section A touches briefly on the criminal activities Yeary engaged in prior to his commission of the crimes charged in this case.  Sections B, C and D set out the circumstances surrounding the searches Yeary contends were illegal because they were warrantless.[4]

new trial on three grounds, arguing that the District Court abused its discretion (1) in denying his motion to sever the counts into three groups, each involving one of the three searches that led to his convictions, (2) in denying his pro se motion for the court's recusal based on alleged "sarcastic comments" the court made, and (3) in instructing the jury in accordance with the Eleventh Circuit's Pattern Jury Instruction on the elements of a 18 U.S.C. § 924(c) violation.  We find no abuse of discretion in any of these arguments.  Thus, whether his convictions stand or fall depends on our disposition, in part III, infra, of his arguments that the District Court erred in denying his motions to suppress evidence.  As for Yeary's sentences, we find no merit in the argument that the court abused its discretion under the Eighth Amendment in imposing consecutive sentences for the 18 U.S.C. § 924(c) convictions.

    [4] As indicated in note 3, supra, Yeary contends that the evidence was insufficient to convict.  In sections A through D, after considering the evidence presented in the Government's case in chief in the light most favorable to the jury's verdict, United States v. Garcia-Bercovich, 582 F.3d 1234, 1237 (11th Cir. 2009), we recite the facts such evidence established.  (After the Government rested its case, Yeary moved the court for a judgment of acquittal pursuant to Fed. R. Crim. P. 29.  The court denied the motion with respect to all counts save Count 6 and Yeary rested his defense without presenting any evidence).  The District Court based its rulings denying Yeary's motions to suppress the evidence obtained in the searches of his residences on the evidence giving rise to the facts recited in sections B through D and the evidence Yeary moved the court in limine to preclude the Government from presenting to the jury.

3

A.

On May 2, 2006, Yeary was convicted of two felonies in the Circuit Court for Palm Beach County, Florida.[5] Because federal law prohibited him from carrying a firearm,[6] Yeary had a friend, Jeff Bell, purchase firearms for his use. On August 12, 2006, Yeary, accompanied by his girlfriend, Lindsey Kline, and Bell went to a gun show, where Bell purchased two firearms, a Glock Model 22 and a Kel Tec.[7] Yeary gave Bell the cash required for the purchases and took possession of the guns upon leaving the gun show. On April 15, 2007, Bell purchased two Taurus 9 millimeter pistols—a Model PT-111 and a Model PT-917—for Yeary. Again, Yeary provided the cash for the purchases and took possession of the guns.

On August 10, 2007, Yeary and Kline got into an argument at a condominium they shared in Boynton Beach, Florida.[8] Following the argument,

---

[5] The felonies were fleeing or attempting to elude a marked police car and resisting arrest.

[6] 18 U.S.C. § 922(g) provides:

(g) It shall be unlawful for any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

[7] The Glock Model 22 and the Kel Tec were the firearms described in Count 15 of the indictment.

[8] Boynton Beach is located in Palm Beach County.

4

Yeary left the condominium.  Thereafter, Kline called the police, and Officer

Connor Haugh of the Boynton Beach Police Department responded to the call.

When Officer Haugh arrived, Kline requested that he stay with her while she

removed her belongings from the condominium, which he did.  As Haugh was

helping her, he saw in plain view a Kel Tec pistol, a cylinder drum filled with

assault-type rifle ammunition, a magazine of ammunition, and a box of

ammunition.  Because Haugh knew that Yeary was a convicted felon and was

prohibited from possessing a firearm, he seized the Kel Tec.  He also seized drug

paraphernalia that Kline pointed out to him, including a digital scale, acetone, a

bowl with residue, and super mannitol (which is used to dilute cocaine).

Responding to a BOLO,[9] the police stopped Yeary on the roadway and arrested

him.[10]

---

[9] A BOLO is a police acronym for "be on the lookout."  See, e.g., United States v. Simms, 385 F.3d 1347, 1350 (11th Cir. 2004).

[10]  The jury was not informed as to whether Yeary was charged with possessing the Kel Tec, or the ammunition, or the narcotic paraphernalia.  The records of the Palm Beach County Circuit Court, of which we take judicial notice, see Fed. R. Evid. 201, reveal, however, that, on August 10, 2007, Yeary was arrested and charged with two counts of possession of narcotics and one count of constructive possession of a firearm by a convicted felon. He was subsequently adjudicated guilty on January 30, 2009, and sentenced to ten months in the county jail.  We do not consider these facts in reaching our disposition of this appeal.

On November 15, 2007, Kline came to the Palm Springs Police Department and met with Officer Joseph Derogatis.[11]  After a brief conversation, she asked Derogatis to accompany her to her residence, a house in Palm Springs. [12]  When they arrived, Kline took the officer to the bedroom she shared with Yeary and showed Derogatis what he described as "items consistent with drug sales, paraphernalia, some ammo cartridges, [and] magazine pouches."  Kline also showed him two safes, "a handgun-type safe . . . on top of a larger safe," and a "press," which, Derogatis concluded, was "used for compressing powered cocaine . . . making it a tight package to be shipped and delivered . . . to resell."

Derogatis then summoned an officer who handled a "K-9 dog."  The dog alerted the officers to the presence of drugs.  After a search warrant issued, Derogatis opened the safes.  The larger safe contained $1,800 in cash and a Styrofoam cup with two plastic bags filled with white powder.  The smaller safe contained an empty prescription bottle bearing the name Brian Yeary.

---

[11]  Prior to his trial, Yeary moved the District Court in limine to exclude all of the evidence related to the events leading to Kline's trip to the Palm Springs Police Department. The court granted his motion; thus, the jury did not hear the following.  Around 7:30 a.m. on November 15, Kline called the police to report a home invasion.  Officers came to her residence and discovered her in a mentally disheveled state; there was no home invasion, so they left. Later in the morning, officers on patrol found Kline driving erratically.  They stopped her and discovered that she had been pistol-whipped in the head; she exhibited a "major gash."  The officers took her to the hospital.  It was after she was discharged that she came to the police station and met with Officer Derogatis.

[12]  Palm Springs is in Palm Beach County, a few miles south of Boynton Beach.

6

B.

At some point in time, the Palm Beach County Circuit Court issued a warrant for Yeary's arrest.[13]  The County Sheriff's Office was unable to find him, so it contacted the U.S. Marshal's Fugitive Task Force for assistance.  The Task Force suspected that Yeary was living with Kline in a house in Stuart, in Martin County,[14] and, on June 16, 2008, three Deputy U.S. Marshals and five Sheriff's Office deputies were sent to arrest him.  Kline—who at the time was pregnant with Yeary's child—opened the door; Yeary stood behind her.  A black semiautomatic handgun was on a table next to Yeary in the deputies' plain view.

Yeary was arrested and removed from the house.  Kline was asked if there were others in the house.  She said that two other people were there.  During the protective sweep that followed, the deputies discovered in plain view in Kline and Yeary's bedroom a black tray that had narcotic residue, marijuana clippings, scales with cocaine residue, and Ziploc baggies used for packaging narcotics, along with other drug paraphernalia.

---

[13]  The jury was not informed of the crime alleged in the warrant or whether Yeary was convicted of the crimes following his arrest.  In his opening statement to the jury, the Assistant U.S. Attorney said that the warrant arose out of the November 15, 2007, incident described in the preceding text, but he introduced nothing in the Government's case in chief to support the statement.

[14]  Martin County, Florida, is immediately north of Palm Beach County.

Based on this discovery, a Martin County Sheriff's Office deputy obtained a search warrant for the house. The ensuing search uncovered, and deputies seized, 51.8 grams of cocaine, 97.1 grams of marijuana, and a firearm. The marijuana was packaged in small baggies, all stored in a Ziploc bag. The cocaine was similarly packaged in baggies that were placed in a larger bag. A safe containing Yeary's driver's license, approximately $3,000 cash and a 9 millimeter ammunition cartridge was also seized.

Lindsey Kline testified that Yeary made his living selling drugs, including cocaine, marijuana, and prescription pills. She and others Yeary employed made sales for him. Yeary's cocaine source was a man named Pepe, who supplied Yeary with 5.25 ounces of cocaine every other week.

Kline produced several photographs depicting Yeary holding firearms and drugs. One of the photos, taken on January 1, 2008, showed Yeary holding a Remington Model 870 shotgun.[15]

C.

In February 2009, Yeary was placed under in-house arrest pending trial on felony charges in the Palm Beach County Circuit Court.[16] As a condition of

---

[15] On the basis of this photo, the Government charged Yeary with one count (Count 13) of possessing a Remington Model 870 shotgun, in violation of 18 U.S.C. § 922(g).

8

release, the Circuit Court required Yeary to agree with the Palm Beach County

Sheriff's Office's Alternative Custody Unit (the "ACU") that it could search his

residence[17] at any time without prior notice and without a warrant.[18]  Yeary agreed

to this condition by executing a written agreement to that effect with the ACU.

On June 1, 2009, the ACU received an anonymous tip that Yeary was selling

drugs out of his residence.  Before the ACU could dispatch officers to Yeary's

residence, Yeary moved his residence to a house in Lake Worth.[19]  He informed

the ACU of the move, and it had him sign a new agreement.

Shortly thereafter, on June 24, responding to the anonymous tip, officers of

the ACU, a Sheriff's Office detective, and Agent Troy Raines of the Bureau of

Alcohol, Tobacco, Firearms, and Explosives went to Yeary's Lake Worth

residence.  Yeary and three others were at the residence when officers arrived.

Yeary complied with officers' request to search his residence.  Agent Raines and

the detective found drugs and a Sig Sauer Model P229 firearm loaded with Fiocchi

.40 caliber rounds in Yeary's bedroom.  They also found a digital scale, Ziploc

---

[16]  The District Court sustained Yeary's objection to the jury's being informed of the charges for which he was awaiting trial.  The record discloses that the charges were cocaine trafficking and burglary with assault and battery, but not the dates the offenses occurred.

[17]  The record does not indicate the location of Yeary's residence at the time he was initially placed under in-house arrest.

[18]  The relevant provisions of the ACU agreement are quoted in note 26, infra.

[19]  Lake Worth is in Palm Beach County.

bags similar to the ones found during the previous search of Yeary's Stuart residence, and a pair of shorts with a concealed pocket containing a bag of cocaine. In total, they seized 50.9 grams of cocaine, 5.5 tablets of Xanax with a net weight of 1.4 grams, 39 tablets of oxycodone tables with a net weight of 19.2 grams, and 1.9 grams of marijuana.

On November 2, 2010, a federal grand jury returned a multi-count indictment against Yeary, charging him with some of the drug and firearm offenses involved in this appeal,[20] and a warrant for his arrest issued.

### D.

On the night of November 10, 2010, Yeary was shot in the leg outside of a bar, "Apple Bottoms," in the Palm Beach County town of Lantana. At the time, Yeary was carrying a Taurus 92AFS 9 millimeter firearm loaded with fourteen live rounds. Two friends drove him to a friend's house. Another friend, Sean East, met Yeary and his friends there, took possession of Yeary's firearm, placed it in his vehicle, and prepared to drive Yeary to the hospital. Detectives from the Palm Beach County Sheriff's Office, which had been called by one of the two friends

---

[20] The record does not indicate whether, as the result of the June 24, 2009, search of Yeary's Lake Worth house, the Palm Beach County Circuit Court vacated its February 2009 order placing Yeary under in-house arrest pending trial. Nor does the record indicate the outcome of that trial. What the record does reveal is that on November 10, 2010, Yeary was not in custody, as indicated in section D that follows.

10

who had been with Yeary at the bar, arrived at the scene before East could take Yeary to the hospital.  Also arriving at the scene were paramedics assigned to the County's fire and rescue unit.  The paramedics took Yeary to the hospital.  Detective James Evans stayed behind to look for the gun Yeary was carrying at the time he was shot.  East told him that the gun was in his vehicle.  With East's permission, Evans directed a crime scene investigator to enter the vehicle and retrieve the gun.

Meanwhile, following Yeary's indictment on November 2, Agent Raines set out to locate Yeary.  Around midnight on November 10, Detective Evans called Raines to let him know that Yeary had been shot and taken to the hospital.  He also informed Raines that Yeary had been living in a condominium in Lantana.

At 4:30 a.m. on November 11, Raines and Evans went to Yeary's condominium to inform its residents of Yeary's shooting and hospitalization.  Nicole Sackmann—Yeary's girlfriend who was pregnant with his child—met them at the door.  Raines and Evans identified themselves, informed her that Yeary had been shot and taken to the hospital, and asked permission to enter.  She granted it and let them in.

Inside the condominium, the officers saw a bag they thought contained cocaine.  With that discovery, they asked Sackmann, who had mentioned that she was leasing the condominium, if she would consent to a search of the

11

condominium and presented her with a "consent form" that included a notice stating that she had the right to withhold her consent. She granted their request and signed the consent form.

During the ensuing search, the officers found a safe, thirty-eight rounds of .40 caliber Smith and Wesson bullets, a plastic bag with cocaine residue, and another bag with 8.8 grams of cocaine. After the officers obtained a warrant to search the safe, they discovered a pill bottle containing twenty oxycodone pills and $2,000 cash.

On November 11, while in the hospital, Yeary was arrested by a deputy U.S. Marshal on the warrant that issued pursuant to the grand jury indictment returned on November 2. The next day, Yeary was taken before a U.S. Magistrate Judge for a detention hearing.[21] The Magistrate Judge ordered that he be temporarily detained in the Palm Beach County jail and scheduled his arraignment and a detention hearing for November 29. Yeary was arraigned that day and, represented by retained counsel, entered a plea of not guilty.[22] He then asked the Magistrate Judge to continue his detention hearing; his request was granted. On December 17,

---

[21] The Federal Public Defender represented Yeary at the hearing on a temporary basis because Yeary informed the court that he intended to retain counsel.

[22] Retained counsel moved the District Court to withdraw as Yeary's counsel on February 9, 2011. The court granted his motion and, apparently finding Yeary indigent, appointed counsel to represent him.

the Magistrate Judge, after entertaining the parties' evidentiary submissions, ordered Yeary detained in the County jail pending trial.[23]

Yeary made several telephone calls from the jail while being detained; all outgoing calls, except for those he made to his attorney, were recorded pursuant to Sheriff's Office protocol. At trial, the Government played some of the recordings for the jury.

One of the calls was to Jeff Bell, who connected the call to Sackmann's phone. During that conversation, which occurred on January 1, 2011, Yeary explained he was shot at Apple Bottoms to "bust a sale" and referred to his pending drug sale with a person named Corey. He also stated that he was armed at the time and intended to shoot the person who shot him. Yeary again spoke with Sackmann on January 28, 2011. She advised him of a drug sale she had transacted.

On February 5, 2011, Yeary called his former girlfriend, Lindsey Kline, and criticized her for leaving him in jail when, according to Yeary, Kline had been his accomplice. He said,

> You were out there with me[,] you were enjoying all the fruits of the shit when I was selling dope and all the fucking money it was bringing. You were enjoying the fucking lifestyle that we were living,

---

[23] As indicated in note 1, supra, Yeary was tried on a second superseding indictment. The first superseding indictment was returned on February 3, 2011; the second superseding indictment was returned on April 7, 2011. Yeary remained in pretrial detention in the Palm Beach County jail throughout the prosecution of this case.

but right now I am the one in here by myself serving the fucking time for what we were doing.

When Kline responded that Yeary was in jail for possessing a gun, not for selling drugs, Yeary disagreed, stating, "I am in here because I was a fucking drug dealer."

## II.

Yeary moved the District Court to suppress the evidence obtained in the warrantless searches described in sections B, C and D of part I, supra. The District Court, after entertaining the factual circumstances of the searches, denied the motion.

Addressing the part I.B search, which took place on June 16, 2008, at Yeary's house in Stuart, the District Court expressly made the following findings: (1) The deputies possessed a valid warrant for Yeary's arrest[24] when they knocked on the door; after Kline opened the door but before entering the house, the deputies saw a gun in plain view on the table next to where Yeary was standing; this gave them a lawful basis for entering the home. (2) Yeary was placed under arrest and removed from the house. (3) Kline informed officers that there were two other individuals in the residence. (4) This information, combined with the arrest

---

[24] Yeary did not contest the validity of the warrant when the deputies arrested him or in prosecuting his motion to suppress.

14

warrant and discovery of a firearm, created a reasonable basis for the arresting officers to fear for their safety. (5) Based on the reasonable fear for their safety, the detectives conducted a protective sweep. (6) The protective sweep was limited in time and scope to locate the other individuals in the house. (7) While conducting the sweep, the deputies saw in plain view the drugs and drug paraphernalia that gave the detectives probable cause to apply for a search warrant.

Turning to the part I.C search, which took place on June 24, 2009, at Yeary's house in Lake Worth while he was in in-house arrest under ACU supervision, the court made these findings: (1) Yeary knowingly and voluntarily consented to searches of his residence as a condition of being placed on in-house arrest. (2) In light of Yeary's risk of flight, criminal history, and threat to kill Kline, in addition to the charges he faced—cocaine trafficking and burglary with assault and battery—agreeing to a search of his premises by the ACU was reasonable to protect the safety of others. (3) Requiring Yeary to waive his right to withhold consent to a search of his residence without a warrant was not unreasonable in light of the alternative he faced—pretrial detention. (4) Yeary did not have a reasonable expectation of privacy at the time of the search. (5) The officers had a reasonable suspicion that Yeary possessed contraband, which justified the search.

15

Regarding the part I.D search, which took place on November 11, 2010, at the Lantana condominium in which Yeary was apparently living, the court found as follows: (1) Sackmann, Yeary's girlfriend at the time, greeted Agent Raines and Detective Evans when they announced their arrival. (2) Sackmann informed the officers she was the lessee of the premises. (3) Sackmann invited officers into the residence to discuss Yeary's shooting. (4) Sackmann was not coerced or threatened. (5) Inside the residence, the officers observed in the living room in plain view a blue Ziploc bag containing what they suspected was cocaine residue. (6) The officers then asked for Sackmann's permission to search the residence. (7) Sackmann knowingly and voluntarily consented verbally and in writing to the search.

### III.

Yeary argues that the District Court erred in denying his motion to suppress the three searches at issue in this case because they cannot withstand Fourth Amendment scrutiny.[25]

---

[25] In reviewing the District Court's denial of Yeary's motion to suppress, "we review its findings of fact for clear error and its application of law to those facts de novo." United States v. Ramirez, 476 F.3d 1231, 1235 (11th Cir. 2007). We consider the evidence in the light most favorable to the District Court's judgment. Id. at 1236. "In addition, we may affirm the denial of a motion to suppress on any ground supported by the record." United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

16

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980). This presumption is "subject only to a few 'jealously and carefully drawn' exceptions." McClish v. Nugent, 483 F.3d 1231, 1240 (11th Cir. 2007) (quoting Georgia v. Randolph, 547 U.S. 103, 109, 126 S. Ct. 1515, 1520, 164 L. Ed. 2d 208 (2006)). Although each of the three searches in this case occurred without a warrant, we hold that an exception to the warrant requirement justified each search. Because each search implicates a different exception to the presumption that warrantless searches of a home are unreasonable, we analyze the circumstances of each search separately.

## A.

The District Court upheld the search of Yeary's Stuart residence on the ground that the search was a valid protective sweep, justified by Kline's statement to the deputies that there were two other individuals in the home. Law enforcement officers are permitted, in the context of a valid arrest, to conduct a protective sweep of a residence for officers' safety. See Maryland v. Buie, 494 U.S. 325, 333–35, 110 S. Ct. 1093, 1097–99, 108 L. Ed. 2d 276 (1990); United

17

States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995) ("Officers have a legitimate interest 'in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.' " (quoting Buie, 494 U.S. at 333, 110 S. Ct. at 1098)).  Such a sweep must be brief and limited to areas from which an attack could be launched.  As the Supreme Court has indicated:

> [A] protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.  The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

Buie, 494 U.S. at 335–36; 110 S. Ct. at 1099.  To justify a protective sweep, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer's belief in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Id. at 334, 110 S. Ct. at 1098.

We agree that the deputies conducted a valid protective sweep of the Stuart residence.  First, the arrest warrant, standing alone, would have given deputies the authority to enter the home.  See Payton, 445 U.S. at 603, 100 S. Ct. at 1388 ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason

18

to believe the suspect is within."); United States v. Bennett, 555 F.3d 962, 965 (11th Cir. 2009). Of course, the deputies did not enter the home to make the arrest; Yeary cooperated, left the home and was arrested—but only after the deputies saw a firearm in plain view. The deputies then learned of the presence of two unknown individuals in the residence. Based on these two facts, the deputies could have reasonably suspected that they were in danger. See Hromada, 49 F.3d at 690 n.9 ("[T]he dangers presented by in-home arrests are often greater than those conducted on the street due to the 'home turf' advantage the suspect has over the police."). Therefore, the deputies were justified in engaging in a protective sweep. Moreover, the sweep was limited in scope; it was only coincidental that one of the deputies discovered contraband in plain view while conducting the sweep. See United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006) ("The plain view doctrine allows police officers to seize any contraband in plain view if the officers have a right of access to the place where the contraband is located." (quoting United States v. Rodgers, 924 F.2d 219, 221 (11th Cir. 1991)). We therefore hold that the Stuart search was valid.

B.

In February 2009, after Yeary was arrested in Palm Beach County on felony charges, he appeared before the Palm Beach County Circuit Court at a detention hearing. At the conclusion of the hearing, the court ordered that, pending his trial,

19

Yeary be placed under in-house arrest under the supervision of the ACU (as opposed to being held in jail). The conditions of his in-house arrest, which Yeary accepted by entering into an agreement with the ACU, prohibited him from engaging in illegal activity, including possessing drugs, firearms, or ammunition. To ensure that Yeary did not possess such items, he agreed that his residence would be subject to warrantless searches.[26]

On June 24, 2009, officers of the ACU, accompanied by other law enforcement personnel, acting on an anonymous tip that Yeary was trafficking drugs from his residence, went to the house in Lake Worth in which he was then

---

[26] The ACU agreement contained the following provision:

The participant and all other residents must allow Alternative Custody staff access to the residence and any vehicles owned, leased, or rented by the participants and all other residents without prior notice 24 hours a day. The Alternative Custody staff will enter the residence to inspect and maintain monitoring equipment, check on the participant's welfare and presence, compliance with the program rules, and will conduct warrant-less searches of the residence to ensure the participant is not involved in any illegal activity or in possession of any illegal substances.

(emphasis added). The ACU agreement contained another provision, which stated:

By signing this agreement I indicate I have read, understand, and agree to abide by all terms and conditions of this agreement and I waive any objections to warrant-less and forced entry to my residence and warrant-less searches of my residence.

(emphasis added). Yeary's signature appears directly below this second quoted portion of the ACU agreement.

20

living and conducted a warrantless search that yielded drugs, a firearm, and ammunition.

There is no doubt that Yeary agreed to warrantless searches of his residence as a condition of his in-house arrest. Therefore, the constitutionality of the Lake Worth search necessarily turns on the validity of Yeary's consent.

In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), the Supreme Court established the still-prevailing framework for analyzing consent searches:

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

Id. at 248–49, 93 S. Ct. at 2059. Although the search in Bustamonte occurred in the context of an automobile, the Supreme Court has applied its framework for consent searches to searches of the home as well. See Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797, 111 L. Ed. 2d 148 (1990) ("The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained . . . ."

21

(citations omitted)); see also United States v. Garcia, 890 F.2d 355, 360–62 (11th Cir. 1989) (applying the Bustamonte framework to the search of a home).

"The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004) (citation omitted). "A district court's determination that consent was voluntary is a finding of fact, that will not be disturbed on appeal absent clear error." United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).

In examining the totality of the circumstances, it becomes clear to us that Yeary knowingly consented to the search of his residence. At the suppression hearing, Sergeant Lawrence of the ACU explained that Yeary was given the opportunity to read and review the ACU agreement—"page by page, line by line, paragraph by paragraph"—with the ACU deputy in charge of his case, so that he could fully understand the conditions of his in-house arrest.[27] His agreement with

---

[27] Although counsel was not present when Yeary signed the ACU agreement, we do not believe this fact alters the analysis. We are focused on whether Yeary's signature—and therefore his consent to search—was knowing and voluntary, not on whether he was fully appraised by counsel of the implications of consenting to a search. The presence and advice of counsel is certainly not a prerequisite to a finding that a suspect knowingly and voluntarily consented to the run-of-the-mill consent search of a home. See Schneckloth v. Bustamonte, 412 U.S. 218, 243–45, 93 S. Ct. 2041, 2056–57, 36 L. Ed. 2d 854 (1973) ("Those cases that have dealt with the application of the Johnson v. Zerbst[,304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461

22

the ACU plainly stated that he would allow ACU staff access to the residence twenty-four hours a day for warrantless searches. Before he signed the agreement, Yeary acknowledged that he understood and agreed to abide by its terms. Indeed, above the signature line was the statement, "I waive any objections to warrant-less and forced entry to my residence and warrant-less searches of my residence." The agreement was clear: as a condition of in-house arrest, ACU staff would be permitted to enter his residence and conduct a search—at any time and without a warrant—to ensure that he was not engaged in illegal activity or in possession of illegal substances.

The choice Yeary faced—in-house arrest on the terms outlined in the ACU agreement or jail—is not all that different from those we have held to be voluntary in the context of run-of-the mill consent searches. For example, we upheld a search where police officers presented the defendant with the choice of consenting

---

(1938)] rule [regarding waiver of criminal rights] make clear that it would be next to impossible to apply to a consent search the standard of 'an intentional relinquishment or abandonment of a known right or privilege.' . . . It would be unrealistic to expect that in the informal, unstructured context of a consent search, a policeman, upon pain of tainting the evidence obtained, could make the detailed type of examination demanded by Johnson."). Neither do we think counsel is required when the consent to search comes in the form of an agreement to a condition to in-house arrest. The presence or absence of counsel is but one factor we consider when determining whether the consent was in fact knowing and voluntary. Cf. Bustamonte, 412 U.S. at 227, 93 S. Ct. at 2048 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").

23

to the search or having his house "dug up" once a search warrant was obtained. See United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989) ("Even if the officers stated that they could come back and 'dig the place up,' such a statement does not amount to coercion. [The defendant] was free to force the agents to obtain a search warrant and, if at that time, he did not want 'his whole place dug up,' [he] could have cooperated."). Similarly, we have found consent to be voluntary where fourteen police officers were present at the defendant's house when they arrested and handcuffed him and where the officers refused to accept the defendant's conditional consent to search only the part of the house, stating they would instead obtain a search warrant unless the defendant consented to a full search. See United States v. Garcia, 890 F.2d 355, 360–62 (11th Cir. 1989). Still another case that supports our conclusion that the consent in this case was voluntary is United States v. Espinosa-Orlando, 704 F.2d 507 (11th Cir. 1983). In Espinosa-Orlando, the defendant was pulled over by officers on suspicions that he was transporting drugs. Id. at 510. With guns drawn, four officers ordered the defendant to get out of his car and lie on the ground. Id. Three of the officers holstered their guns while the other pointed the gun elsewhere; then one of the officers asked for the defendant's consent to search the car. Id. at 513. The defendant consented, and we held that the consent was voluntary and uncoerced. Id.

24

From these cases it becomes clear that Yeary was hardly faced with the Hobson's choice he presents. He was not entitled to release on bail; given his criminal history, his risk of flight, and his threat to kill Kline, the court had more than ample grounds to detain him pending trial. Viewed in this light, we find entirely reasonable the court's requirement that, if he desired in-house arrest rather than detention in jail, Yeary would have to consent to warrantless searches of his residence.[28] In short, the imposition of the condition does not amount to coercion sufficient to render Yeary's consent invalid.

Our review of the evidence presented at the suppression hearing reveals that the District Court did not err in finding that Yeary knowingly and voluntarily

---

[28] We note that the Federal Bail Reform Act of 1984, Pub. L. 98-473, 98 Stat. 1837 (codified as amended at 18 U.S.C. §§ 3141–3156), authorizes a federal court to impose conditions similar to the ones imposed by the state court here. For example, a federal judge may require that an arrestee "undergo available medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency," 18 U.S.C. § 3142(c)(1)(B)(x), which likely would include random searches and drug testing. Additionally, a federal judge is authorized to impose "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(xiv).

Moreover, the Supreme Court has recognized that "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling," and can justify the detention of an arrestee prior to trial when the detention is a product of an individualized determination that such detention is necessary to prevent crime. United States v. Salerno, 481 U.S. 739, 749, 107 S. Ct. 2095, 2103, 95 L. Ed. 2d 697 (1987) (upholding the constitutionality of the Federal Bail Reform Act of 1984). If it is permissible to detain a federal arrestee and deprive him of his liberty—including any expectation of privacy with respect to his housing unit, see 28 C.F.R. § 552.14(a) ("Staff may search an inmate's housing and work area, and personal items contained within those areas, without notice to or prior approval from the inmate and without the inmate's presence.")—then surely the less restrictive deprivation involved here is valid.

25

consented to the warrantless search of his Lake Worth home.  Thus, the warrantless search was valid.

C.

The District Court upheld the search of Yeary's Lantana residence on the ground that the lessee of the condominium, Sackmann, voluntarily consented to the search.  "[A] warrantless entry is valid when it is based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed authority over the premises."  United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008).

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent . . . rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

United States v. Matlock, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 n.7, 39 L. Ed. 2d 242 (1974) (citations omitted).  The Government, of course, bore "the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily."  United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004) (citation omitted).

26

A review of the evidence presented at the suppression hearing reveals that the District Court did not clearly err in finding that Agent Raines and Detective Evans reasonably believed that Sackmann, as the condominium's lessee, possessed authority to consent to the search.[29]  Nor did the court err in concluding that she gave her consent freely and voluntarily.

IV.

For the reasons set out above, we find no error in the District Court's denial of Yeary's motion to suppress.  The court's judgment is, accordingly,

AFFIRMED.

---

[29]  If it is the case that whether the officers' belief was reasonable is a mixed question of fact and law, we conclude that the court committed no error in concluding that their belief was reasonable.

Martin, Circuit Judge, Concurring Specially:

I concur in the result the majority reaches in this case. I write separately, with the utmost respect for my colleagues, because I cannot concur in the reasoning the majority adopts in Part III.B of its opinion. In my view, the majority's conclusion that Mr. Yeary's consent to warrantless searches as a condition of pre-trial release gave the government unfettered authority to search his home "at any time," supra at 9, 23, is unnecessary. I would uphold the searches not under the consent doctrine (as the majority does), but instead under the traditional totality-of-the-circumstances approach to analyzing the constitutionality of warrantless searches and seizures. The majority goes beyond principles established in our precedent or that of the Supreme Court when it decides the case based on Mr. Yeary's consent alone. I am mindful that Mr. Yeary was presumed to be innocent at the time he gave this consent. For these reasons, I cannot acquiesce in the majority's position that consent to searches exacted from a person who has been charged but not convicted of a crime, in exchange for his liberty leading up to a criminal trial, causes him to forfeit all protections the Fourth Amendment would otherwise afford him.

Today's majority relies on the admittedly well-settled principle that a search conducted pursuant to valid consent is constitutionally permissible. Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973). Under the consent

28

doctrine, a search that might otherwise violate the Fourth Amendment will be upheld so long as the government can establish that a person freely and voluntarily consented, waiving his rights under the Fourth Amendment.  See id.

To say that the principle is well-settled is, however, quite different than saying that it has been readily extended.  To date, the Supreme Court has avoided applying the consent doctrine to uphold the very sort of search presented by Mr. Yeary's case: a search conditioned on an agreement made by a probationer or parolee as a condition of his release from jail.  See United States v. Knights, 534 U.S. 112, 118, 122 S. Ct. 587, 591 (2001) ("We need not decide whether [the probationer's] acceptance of the search condition constituted consent in the Schneckloth sense of a complete waiver of his Fourth Amendment rights . . . ."); Samson v. California, 547 U.S. 843, 852 n.3, 126 S. Ct. 2193, 2199 n.3 (2006) ("[W]e need not reach the issue whether [the parolee's] acceptance of the search condition constituted consent in the Schneckloth sense of a complete waiver of his Fourth Amendment rights." (quotation marks and alterations omitted)).

Rather than relying on the consent doctrine, the Supreme Court has instead applied the totality-of-the-circumstances balancing test that ordinarily governs warrantless searches.  Whether a search is reasonable under the totality-of-the-circumstances approach "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to

29

which it is needed for the promotion of legitimate governmental interests." Knights, 534 U.S. at 118–19, 122 S. Ct. at 591 (quotation marks omitted).  This analysis assumes—contrary to the consent doctrine upon which the majority relies—that the government's authority to invade an individual's privacy is still limited by its interest in doing so even when the individual consents to the invasion.

I read the majority opinion to hold that consent to searches as a condition of release from custody amounts to a forfeiture of all Fourth Amendment protections, doing away with the traditional interests-balancing analysis.  I would not go this far.  Instead, I would follow the Supreme Court's tack in Knights and Samson and resolve the constitutionality of the search of Mr. Yeary's Lake Worth residence under the traditional totality-of-the-circumstances approach.

In Knights, the defendant agreed to permit warrantless searches of his residence as a condition of his probation.  534 U.S. at 114, 122 S. Ct. at 589.  Acting pursuant to the search condition, officers later searched Mr. Knights's residence and discovered incriminating evidence.  Id. at 115, 122 S. Ct. 589.  In reviewing the constitutionality of this search, the Supreme Court did not find Mr. Knights's consent dispositive, as today's majority would have it.  Rather, his consent was a "salient" factor in assessing his reasonable expectation of privacy under the totality of the circumstances test.  Id. at 118, 122 S. Ct. at 591.  Because

30

Mr. Knights had consented to government intrusions, the Supreme Court reasoned, the extent to which he could reasonably expect to be free of such intrusions was "significantly diminished."    Id. at 119–20, 122 S. Ct. at 592.  And the Court balanced this diminished individual privacy interest against the government's significant interest in regulating probationers and reintegrating them into society in light of their higher propensity to engage in criminal conduct than the general public. Id. at 120–21, 122 S. Ct. at 592.  This balance, the Supreme Court held, weighed in favor of permitting searches conducted pursuant to a probationer's consent as a condition of release, at least when based on reasonable suspicion.  Id. at 121, 122 S. Ct. at 592.

In Samson, the Supreme Court considered the question left open in Knights: whether a search predicated on consent to search as a condition of release from government custody would be permissible even without any individualized suspicion.  Samson, 547 U.S. at 850, 126 S. Ct. at 2198.  Tellingly, even though the Supreme Court framed the question as though consent to the search were dispositive, it still declined to decide the case under the Schneckloth framework. Id. at 852 & n.3, 126 S. Ct. at 2199 & n.3.  Instead, it again assumed that the Fourth Amendment balancing inquiry would limit the government's authority to conduct the search.  The interests balanced were the same as those the Court identified in Knights: the diminished individual privacy interest and the significant

31

government interest in "reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees." Id. at 853, 126 S. Ct. at 2200. The Supreme Court concluded that this balance counseled in favor of permitting even suspicionless searches of post-conviction individuals who had agreed to a search condition as a term of release.[1] Id. at 853, 857, 126 S. Ct. at 2200, 2202.

Turning to Mr. Yeary's challenge, I admit that the balance of interests is much closer than the balance before the Court in Knights and Samson. The diminished individual privacy interest is clear, for Mr. Yeary's in-house arrest agreement "clearly expressed the search condition," and he was "unambiguously informed" of it. Knights, 534 U.S. at 119–20, 122 S. Ct. at 591–92.

But the significance of the government's interest in regulating people like Mr. Yeary before they are convicted is not clearly as strong as it was in Knights

---

[1] It is worth bearing in mind that the Supreme Court in Samson did not sanction a search regime that subjects individuals "to capricious searches conducted at the unchecked whim of law enforcement officers." 547 U.S. at 856, 126 S. Ct. 2202 (quotation marks omitted). Rather, the search regime sanctioned in Samson was one that had procedural safeguards prohibiting "arbitrary, capricious or harassing searches." Id. (quotation marks omitted). I fear that the majority today will allow precisely the sort of search "untethered by any procedural safeguards," id. at 2202 (Stevens, J., dissenting), that the Supreme Court took pains to carve out from the exception to the warrant requirement outlined in Samson. Indeed, Mr. Yeary's consent agreement reveals no procedural safeguards. Neither could I find any statutory provision outside the agreement that gives people subject to it any procedural safeguards comparable to those accompanying the regime upheld in Samson.

32

and Samson.[2]  I readily accept there may be a "propensity" among people who are

released pending trial to get into trouble with the law.  See S. Rep. No. 98-225, at 3

(1983) (noting the "problem of crimes committed by persons on release"); United

States v. Salerno, 481 U.S. 739, 750, 107 S. Ct. 2095, 2103 (1987).  But just how

strong is that propensity compared to that of the general public, which is the

relevant comparative marker the Supreme Court identified in both Knights and

Samson?  Cf. United States v. Mitchell, 652 F.3d 387, 413 (3d Cir. 2011) ("[T]he

interests in supervising convicted individuals on release and deterring recidivism

do not apply to arrestees or pretrial detainees.").

In both Knights and Samson, the government established that it had a

significant interest in regulating people who had been convicted of crimes, and

were serving probation or parole as a result.  Specifically, the government tendered

reliable statistical analyses supporting that interest.  See Knights, 534 U.S. at 120,

122 S. Ct. at 592 (concluding that the recidivism rate of probationers is

significantly higher than the general crime rate based on U.S. Department of

Justice, Bureau of Justice Statistics studies); Samson, 547 U.S. at 853, 126 S. Ct. at

[2] Of course, it is true that Mr. Yeary was technically "post-conviction," to the extent that he did have unrelated prior convictions at the time he consented to the search condition.  But the analysis of the government's interest focuses not on the interest in regulating someone in Mr. Yeary's particular circumstance, but instead on the more generalized interest in regulating the class of people who are facing criminal charges yet released from custody pending trial.  See Knights, 534 U.S. at 120–21, 122 S. Ct. at 592; Samson, 547 U.S. at 853–55, 126 S. Ct. at 2200–01.

33

2200 (discussing several statistical studies demonstrating the significance of the state's interest in supervising parolees in light of their higher propensity to offend). In contrast, the record in this case includes no recent data examining the propensity of pre-conviction individuals to offend while on pre-trial release. I can only assume based on the studies recited in <u>Knights</u> and <u>Samson</u> that the propensity of those charged, but not yet convicted of crimes, to offend exceeds that of the general public. Although I accept the fact of a higher propensity based on these studies, I have no basis for knowing the extent of it. And the extent of the propensity determines, at least to some degree, the significance of the government's interest. Again, there is no data in the record of this case—one way or the other—about the propensity for committing crimes of those who have not been convicted, but are awaiting trial as opposed to those who have been convicted. Based upon this dearth of information, I do not think this is a proper case for extending <u>Samson</u>'s rule permitting suspicionless searches predicated on consent as a condition of release for people convicted of crimes, 547 U.S. at 853, 857, 126 S. Ct. at 2200, 2202, to people who have not. And in any event, no extension of the rule is necessary to reach the result the majority did.

Given this balance of interests, I would uphold the search of Mr. Yeary's Lake Worth residence because it was not suspicionless. Before conducting the search, the officers received an anonymous tip informing them that Mr. Yeary had

34

weapons and drugs in his residence.  This anonymous tip was accompanied by indicia of its reliability—Mr. Yeary's recent arrests for drug-related offenses, of which the officers were aware.  See Florida v. J.L., 529 U.S. 266, 270, 120 S. Ct. 1375, 1378 (2000) (noting that an anonymous tip accompanied by sufficient indicia of reliability may provide reasonable suspicion); see also United States v. Lindsey, 482 F.3d 1285, 1291 (11th Cir. 2007) (finding reasonable suspicion where officers received anonymous tip that was consistent with facts already known to officers by virtue of an ongoing investigation).  The particularized suspicion created by the tip and Mr. Yeary's recent arrests, even if it does not rise to the level of reasonable suspicion, is sufficient in my view to justify the search of Mr. Yeary's home in light of the balance of private and government interests.

I therefore concur in the result reached by the majority, but arrive at that result based upon considerations other than Mr. Yeary's consent in his pre-trial release contract.

35