UNITED STATES of America,
Plaintiff–Appellee,

v.

Juan DELGADO, Dagoberto Silva, Henry Escobar, Defendants–Appellants.

No. 88–5622
Non–Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

June 25, 1990.

**1497**

Dennis G. Kainen, Law Offices of Alan L. Weisberg, Miami, Fla., for Juan Delgado.

Leonard Rosenberg, P.A., Miami, Fla., for Dagoberto Silva.

Roy E. Black, Black and Furci, P.A., Miami, Fla., for defendants-appellants.

Frank H. Tamen, Linda Collins–Hertz, Mayra R. Lichter, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, FAY and COX, Circuit Judges.

TJOFLAT, Chief Judge:

Appellants, Dagoberto Silva, Juan Delgado, and Henry Escobar, appeal their convictions on drug-trafficking charges. Escobar also challenges the supervised release portion of his sentence. We affirm the convictions of all three appellants but vacate their sentences in part and remand for resentencing.

## I.

On March 16, 1987, a United States Customs Inspector in Miami, Florida, examined a shipping container that purportedly contained lawn furniture. The inspector found lawn furniture inside the container but also discovered what appeared to be a false wall. The inspector drilled through the back wall of the container and discovered cocaine in a hidden cavity of the container. The United States Customs Service was notified, and a Drug Enforcement Administration Agent, Mark Averi, was assigned to follow the container to its ultimate destination. Working undercover, Agent Averi drove with the shipping company to deliver the container.

The container was delivered to the Ajami Import–Export office where the driver of the truck was greeted by Abdul Ajami and appellant Escobar. Ajami told the driver of the truck to take the container to a warehouse at another location—Ajami and Ricardo Duran would lead the way in their own car. Upon arrival, the truck was backed into the warehouse, and the container was unloaded. At that time, Agent Averi was able to walk inside the warehouse for about five to ten minutes. Agent Averi then left the warehouse, returned to his own vehicle, and immediately went back to the warehouse to establish surveillance.

Surveillance continued through 1:00 p.m. the next afternoon, when a car carrying two people and a van carrying three people arrived at the warehouse. The five people entered the warehouse and remained there for about one hour. Finally, four people emerged from the warehouse carrying small cardboard boxes. Each person carried one box at a time, and each made about ten or twelve trips. The boxes were loaded into the van.

When it was apparent that the last box had been loaded, DEA Agent Peter Culver ordered approximately seven agents to arrest the five individuals and to seize the boxes. This action was taken before obtaining either a search or arrest warrant. Ajami, Duran, and appellants Silva and Delgado were arrested outside the warehouse, while appellant Escobar was arrested inside the warehouse.

Inside the warehouse, Agent Culver found several tools, including two crow bars, a come-along, an electric saw with blades, and an extension cord. From the van, agents seized twenty-two cardboard boxes, as well as one box from the trunk of the car. Each box contained a large quantity of cocaine: all told, the agents seized 634 kilograms of cocaine with an approximate street value of between $7.6 million and $10.8 million.

On March 26, 1987, a federal grand jury returned an indictment, charging Ajami, Duran, and appellants with (1) one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1988); (2) one count of possession of cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and (3) one count of importing cocaine in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 18 U.S.C. § 2.

Appellants were tried together before a jury.[1] During the trial, the Government dismissed the importation charge against Silva and Delgado. Silva and Delgado were convicted on the remaining two counts and both were sentenced to eleven years imprisonment on the conspiracy count and eleven years imprisonment with five years supervised release on the possession count. Escobar was convicted on the conspiracy and possession counts but was acquitted on the importation count. He received sentences of twenty years imprisonment for each count with five years of supervised release to follow imprisonment for the possession count. The sentences for all of the appellants were to run concurrently.

All three appellants challenge their convictions on essentially the same five grounds. Specifically, they argue that (1) the prosecutor made highly prejudicial remarks during closing argument, and the district court should have granted a mistrial; (2) the court abused its discretion in refusing to admit into evidence Ajami's plea agreement; (3) the court abused its discretion in refusing to allow cross-examination of Agent Culver with regard to a post-arrest statement by Ajami or to allow a record of that statement into evidence; (4) the conspiracy and possession convictions were based on insufficient evidence; and (5) all of the evidence seized from the warehouse and the van was seized in violation of appellants' fourth amendment rights. Additionally, Escobar argues that the district court abused its discretion in admitting into evidence his Colombian Master Card. Furthermore, he argues that the court erred in imposing a five-year term of supervised release for the possession conviction. Finally, Delgado and Silva argue that the district court abused its discretion in admitting into evidence two airline tickets in the names of Escobar and Silva. We address each of these arguments in turn.

## II.

■ During closing argument, attorneys for the appellants argued at length that the focus of the Government's case had improperly shifted from Ajami to the appellants. According to the appellants, Ajami masterminded the operation and, therefore, the jury should focus its attention on him. The prosecutor stated in rebuttal that the defendants wanted the jury to

> [i]gnore the reasonable and sensible conclusions that when you have got just single packages like this that are worth more money than a lot of honest working people make in a year's time on an honest job—ignore that; [rather, the defendants wanted the jury to] focus [its] attention ... on people who have either pled guilty in this case or are not shown to have had an active role at all.

Counsel for the appellants objected to this statement. They noted, correctly, that Ajami had pled guilty to an unrelated offense in exchange for the Government's dismissal of the charges in the indictment that gave rise to this case. The court instructed the jury to disregard both the prosecutor's and the defense attorney's comments.

The prosecutor's statement was indeed incorrect and, in certain circumstances, such a statement might be prejudicial. If it were prejudicial, we would reverse a district court's decision not to grant a mistrial only if the court failed to give a curative instruction or, if it did give an instruction, the statement was "so highly prejudicial as to be incurable." *United States v. Slocum*, 708 F.2d 587, 598 (11th Cir.1983). In this case, however, we need not examine the effectiveness of the court's curative instruction since we can find no possibility of prejudice from the prosecutor's remarks. If the appellants were attempting to convince the jury to blame Ajami for the crimes that occurred, we are at a loss as to how the statement that Ajami pled guilty to those crimes could be prejudicial to the appellants. In fact, the prosecutor's misstatement *supports* the appellants' arguments. We hold that the district court properly refused to grant a mistrial.

---

**1.** Ajami entered into a plea agreement with the Government, and Duran's motion for severance was granted. Therefore, Ajami and Duran were not involved in the appellants' trial.

### III.

[2] Appellants argue that the district court abused its discretion in refusing to admit into evidence the plea agreement and colloquy between Ajami and the Government. In that agreement, Ajami pled guilty to importing certain artifacts from Ecuador by means of a false or fraudulent invoice, and the Government agreed to dismiss the charges contained in the March 26, 1987 indictment. Appellants would have us believe that the agreement and colloquy before the court constitute hearsay evidence that should have been admitted under Fed.R.Evid. 801(d)(2)(D) as admissions by a party opponent. According to the appellants, the Government's decision to dismiss the charges in the indictment involved in this case was an admission that Ajami was not guilty of the alleged conspiracy. Such an admission, in turn, would constitute evidence that the appellants did not conspire with Ajami.

We cannot agree with the appellants. There are many factors that influence the government's decision not to prosecute a defendant on certain charges, one of the most common being the government's interest in obtaining the cooperation of the defendant as a witness against codefendants. Certainly, we cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty. Furthermore, by holding that the government admits innocence when it dismisses charges under a plea agreement, we would effectively put an end to the use of plea agreements to obtain the assistance of defendants as witnesses against alleged co-conspirators.

[3] Even if we did agree with the appellants that the government's decision to drop certain charges might constitute an admission of innocence, adopting their argument would create other serious problems at trial, and evidence of the government's decision likely would not be admissible. The government's decision not to prosecute a defendant on certain charges reflects, *at best,* the government's *opinion* that the defendant is not guilty. Thus, the opinion has no more evidentiary value than the opinion of the defendant's attorney, expressed during argument to the jury, that the defendant is not guilty. Even if such evidence is relevant, it would not be admissible under Rule 403. If the evidence were admitted, the government's counsel likely would take the stand and testify that the charges were dropped for reasons unrelated to the guilt of the defendant. The reasons expressed by the government's counsel could be highly incriminating with regard to the defendant who is seeking to have the evidence admitted. Thus, the district court should probably hold the technically admissible opinion evidence inadmissible because it would open the door to evidence on collateral issues that would likely confuse the jury.

Finally, we have examined the colloquy that occurred when the court accepted Ajami's plea. We have found nothing that conceivably could constitute an admission by the Government that Ajami was not guilty of the conspiracy count. We therefore affirm the district court's refusal to admit the plea agreement and colloquy into evidence.

### IV.

[4] Appellants next argue that the court abused its discretion in refusing to allow them to cross-examine Agent Culver with regard to a statement made by Ajami to Culver immediately after Ajami was arrested or to introduce Agent Culver's written report of that statement. The report reads as follows:

> Ajami, when questioned by Special Agent Culver, stated that he was in the warehouse unloading merchandise. Ajami stated that he was an importer of furniture. Ajami said that four persons just showed up at the warehouse and Ajami did not know why. Ajami stated that he thought he might know who the other four persons were, that he had seen them before. Ajami further stated that he did not know where the van came from or who was driving. When questioned by Special Agent Culver about the container, Ajami stated that he did not want to answer any more questions.

Appellants maintain that this report should have been admitted and they should have been allowed to cross-examine Agent Culver with regard to this statement because (1) it was a statement against Ajami's penal interest and therefore an exception to the hearsay rule under Fed.R.Evid. 804(b)(3), or (2) it so exculpated the appellants that excluding evidence of this statement denied the appellants due process of the law.

Rule 804(b)(3) provides that "[a] statement which ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true" is excluded from the hearsay rule. We are unable to discern how Ajami's statement could fall under this exception. Considering the statement made and the circumstances of the arrest, we think that the statement was made to conceal the existence of a conspiracy. The statement therefore was in no way contrary to Ajami's penal interest; rather, it was likely made as an attempt to exculpate Ajami from the conspiracy. And even if the statement was not made to conceal the conspiracy, no possible interpretation of the statement could possibly subject Ajami to criminal liability.

We conclude that the district court did not abuse its discretion in refusing to admit, under Rule 804(b)(3), evidence of the statement.

■ Appellants' argument that they were denied due process of law by not being allowed to introduce evidence of the statement is equally unavailing. Appellants cite *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), in support of their argument. In *Chambers*, the Court held that, in certain situations, a defendant's right to confront witnesses and to present witnesses in his own defense outweighs a state's interest in excluding hearsay evidence. The appellants are correct in noting that one important consideration is the degree to which the statement in question exculpates the defendant. The Court in *Chambers*, however, recognized another important consideration: the reliability of the statement. *See id.* at 300–01, 93 S.Ct. at 1048–49.

The circumstances surrounding the arrest indicate that Ajami's statement was not trustworthy; rather, it was a self-serving statement designed to exculpate Ajami from the conspiracy. Moreover, Agent Averi's testimony that Escobar and Duran had been with Ajami the night before seriously undermines the reliability of Ajami's statement that the other four persons "just showed up" and he "did not know why." There are no corroborating circumstances apparent in the record. We hold, therefore, that the appellants' right to confront Agent Culver did not outweigh the interest in excluding hearsay evidence. Evidence of the statement was properly excluded.

### V.

■ Appellants argue that the verdicts of guilty were not supported by the evidence and therefore should be reversed. When reviewing the sufficiency of evidence to support a conviction, we view all of the evidence in a light most favorable to the government, draw all reasonable inferences in favor of the government, and determine whether " 'a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.' " *United States v. Carcaise*, 763 F.2d 1328, 1330–31 (11th Cir.1985) (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

■ Given our standard of review, the evidence clearly warrants affirmance of the guilty verdicts. Although mere association between persons is not sufficient to support a conviction on a conspiracy charge, a conspiracy may legitimately be inferred from circumstantial evidence. *See United States v. Bascaro*, 742 F.2d 1335, 1359 (11th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985). Here, conspiracy and possession easily may be inferred from the evidence.

Agent Averi testified that, when he walked around the warehouse the night before the arrest, he did not see any card-

board boxes resembling those found in the van the next day. Furthermore, he testified that Ajami and Duran left the warehouse that night at the same time he and the truck driver left. Thereafter, a constant surveillance was maintained. Ajami and Duran arrived the next morning at approximately 9:30 and left about one hour later. They returned about two hours later, followed shortly by the van carrying the appellants. When the appellants arrived, Ajami and Duran were in the process of carrying tools from their car into the warehouse. About one hour later, the men began loading the cardboard boxes into the van.

The tools that Ajami and Duran carried into the warehouse when the appellants arrived were the types of tools that would have been needed to remove the false wall in the container. These tools were found on the floor of the warehouse in a state that suggests that they had been in use during the hour in which all five suspects were in the warehouse.

Finally, the Government produced evidence that Delgado, Duran, Escobar, and Silva had substantial prior relationships. For example, Duran's bank statements were sent to Escobar's address, and Delgado, at the time of his arrest, was in possession of telephone numbers belonging to Duran and to Escobar's and Silva's beepers.

We think that, viewing this and other evidence in the light most favorable to the Government, a reasonable trier of fact could have found beyond a reasonable doubt (1) that Escobar, Delgado, and Silva had conspired among themselves and with Duran and Ajami to possess and distribute cocaine and (2) that they were knowingly in possession of the cocaine.

## VI.

Escobar and Silva both challenge the admission of evidence seized during the warrantless search of the van, and Escobar challenges the admission of evidence seized during the warrantless search of the warehouse. We address the search of the warehouse first.

Escobar challenges the admission of certain personal items introduced into evidence. Specifically, he argues that his shirt and papers found in his shirt pocket, which were seized from the warehouse, and his briefcase, which was seized from the van, should not have been admitted into evidence. For the reasons we discuss below, the search of the van and all containers therein was lawful, *see infra* at 1502–1503; therefore, we hold that the district court properly admitted the briefcase into evidence. The admission of certain items seized from the warehouse, however, presents more difficult questions.

■ Escobar's shirt and personal papers were seized under the following circumstances. When the DEA agents converged on the scene to arrest the five suspects, one of the agents noticed somebody running back into the warehouse. Three agents followed the person into the warehouse to perform a protective sweep, and Agent Culver, who had apprehended Ajami, entered the warehouse shortly thereafter. It is not clear from the record whether one or two suspects were apprehended in the warehouse, but it is clear that Escobar was found in the warehouse, shirtless, crouching behind a couch. At that time, prior to obtaining a search warrant, the agents seized a telephone beeper next to the couch and Escobar's shirt, which was on a nearby forklift. The agents found several personal papers in Escobar's shirt pocket. The agents were in the warehouse for three to five minutes before leaving. The warehouse was secured, and no agents entered the warehouse until the search warrant was obtained.

■ The Government contends that Escobar has no standing to challenge the seizure of evidence from the warehouse. We disagree. A person possesses standing when he has a reasonable expectation of privacy from governmental intrusion in either the premises searched or the items seized. *See Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968). Furthermore, the Supreme

Court has held that, in certain circumstances, an employee has standing to challenge searches conducted in his place of employment. *See id.* at 369, 88 S.Ct. at 2124.

In this case, Escobar did not have any general expectation of privacy in the warehouse. Escobar did not have any private space in the warehouse from which he could exclude others. Nor did he have a possessory interest in the building. *See Martinez v. Nygaard,* 831 F.2d 822, 825–26 (9th Cir.1987). This conclusion, however, does not end our inquiry. As one commentator has stated, "[i]t may be significant ... that [the item seized] is a personal possession of the defendant and not something connected with the operation of the business." 3 W. LaFave, Search and Seizure § 11.3, at 566 (1978). Indeed, it appears that, where the defendant's possession was the object of the search, the defendant has standing to challenge the search even though he does not have an expectation of privacy in the premises searched. *See United States v. Alewelt,* 532 F.2d 1165, 1167 (7th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); *see also Martinez,* 831 F.2d at 826 (court finds no standing based on fact that person had "no possessory interest in the place searched *or things seized* " (emphasis added)). We hold, therefore, that Escobar has standing to challenge the seizure of his shirt and the papers contained therein.

■ Although Escobar has standing to challenge this aspect of the search and seizure, he has no basis for the challenge. The Supreme Court recently held that when "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene," officers may search the area in question without a warrant. *Maryland v. Buie,* —— U.S. ——, ——, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990). Any evidence found during "a cursory inspection of those spaces where a person may be found" would then be admissible. *Id.* at ——, 110 S.Ct. at 1099. The sweep, however, may last no longer than is reasonably necessary to dispel the suspicion of danger. *Id.* at ——, 110 S.Ct. at 1099.

The sweep of the warehouse and seizure of Escobar's shirt clearly were valid under *Buie.* When the agents converged on the scene, they had very good reason to believe that at least one, and possibly two, more suspects were hiding in the warehouse. They performed a protective sweep of the warehouse, finding and arresting Escobar in the process. While performing the sweep, the agents seized Escobar's shirt, which was in plain view near where Escobar had been hiding. The sweep lasted no more than three to five minutes. Thus, the agents had reason to believe that the warehouse harbored an individual who could pose a danger to the agents outside the warehouse; the shirt was found in plain view during a cursory inspection; and the sweep was short, apparently lasting no longer than necessary. The district court properly admitted the shirt and papers[2] into evidence.

■ Silva and Escobar[3] maintain that the cocaine seized from the van was seized in violation of the fourth amendment and therefore should not have been admitted into evidence at trial. There is no dispute over the facts: DEA agents, after arresting the suspects, thoroughly searched the van and opened at least two of the cardboard boxes. This search was conducted

---

**2.** Escobar does not describe, and the record does not reveal, the precise manner in which the papers were seized from the shirt. Moreover, Escobar does not specifically challenge the agents' conduct in searching the shirt pocket *once they had seized the shirt,* arguing only that the search of the *warehouse* was improper. Having concluded that the agents' search of the warehouse and seizure of the shirt was proper, we have no occasion to address the validity of the agents' search of the shirt pocket.

**3.** Silva owned the van and therefore has standing to challenge the search. Escobar, on the other hand, may not have had a sufficient expectation of privacy in the van to give him standing to challenge the search. We need not decide this question, however, because, as we explain in the text, the search was valid under the fourth amendment.

without a warrant. Silva and Escobar argue that the search of the cardboard boxes violated the fourth amendment. The Government responds by arguing that the search of the cardboard boxes falls within the automobile exception announced in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and as applied in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). We agree with the Government.

In *Ross*, police officers were informed by a reliable source that the defendant was selling narcotics that were kept in the trunk of his car. Police officers drove to the site where the car was located and shortly thereafter arrested the defendant. Acting without a warrant, one of the officers opened the trunk of the car and found a brown paper bag inside. The officer then opened the bag and discovered within it smaller bags containing heroin. The heroin was admitted into evidence at the defendant's trial. The Supreme Court found no fourth amendment violation in the officer's search of the brown paper bag. It held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825, 102 S.Ct. at 2173.

In *United States v. Amorin*, 810 F.2d 1040 (11th Cir.1987), police had probable cause to believe that a green duffle bag in the defendant's possession contained cocaine. While the defendant's house was under surveillance, the police saw the defendant place the duffle bag in his vehicle. As the defendant was about to enter the vehicle, he was arrested, and the duffle bag was searched without a warrant. We upheld the district court's admission of the cocaine into evidence, holding that the "search of the vehicle clearly falls within the automobile exception to a warrant requirement." *Id.* at 1041 (citing *Ross*).

The search of the cardboard boxes in this case was plainly valid under *Ross* and *Amorin*. DEA agents knew that a shipment of cocaine had been taken to the warehouse. The agents maintained constant surveillance over the warehouse until they witnessed the suspects loading several cardboard boxes from the warehouse into the van. The cardboard boxes were not labelled, which, according to Agent Culver, is a common method of transporting narcotics. The agents unquestionably had probable cause to believe that the boxes contained cocaine and had sufficient grounds for arresting the suspects. Furthermore, since the agents had probable cause to believe that the van contained cocaine, they had probable cause to search the van and all of the contents of the van that might conceal the cocaine. The district court's decision to admit into evidence the cocaine seized from the van was therefore proper under *Ross* and *Amorin*.

## VII.

█ Escobar argues that the court abused its discretion in admitting into evidence his Colombian Master Card found in his wallet at the time of his arrest. According to Escobar, the Master Card is not relevant to any issue in this case, and, even if it is relevant, the prejudice caused by introducing this evidence far outweighs its probative value.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. There is testimony in the record that Colombia is the primary source of cocaine imported into the United States and that Ecuador (the country from which the cocaine in this case arrived) serves primarily as a "transit country" for the exportation of cocaine to the United States. The existence of financial resources in the primary source country indicates an ability to pay for cocaine shipments at the source of supply and has a tendency to make Escobar's involvement in some sort of drug transaction more probable. We think that the Master Card is relevant under Rule 401.

All relevant evidence is admissible, Fed. R.Evid. 402, unless "its probative value is *substantially* outweighed by the danger of

unfair prejudice," Fed.R.Evid. 403 (emphasis added). This determination is left to the discretion of the district court, and we review only for abuse of that discretion. *See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 267 (5th Cir.1980).[4] In this case, the district court determined that the danger of prejudice did not substantially outweigh the probative value of the credit card, and we see no reason to question that holding. Although the credit card is no more than circumstantial evidence, it does not have " 'an undue tendency to suggest [a] decision on an improper basis, [particularly] an emotional one.' " *See Cauchon v. United States*, 824 F.2d 908, 914 (11th Cir.) (quoting *United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir.1979), *vacated*, 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980)) (no danger of unfair prejudice in admitting evidence that person charged with possession of controlled substance advertised in magazine that advocated use of recreational drugs), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). We hold that the district court did not abuse its discretion in admitting the credit card into evidence.

## VIII.

 Escobar argues that, because the offense occurred prior to November 1, 1987, the district court did not have the authority to impose the five-year period of supervised release to follow the term of imprisonment for the possession conviction. *See United States v. Levario*, 877 F.2d 1483, 1487–89 (11th Cir.1989) (provisions of Anti–Drug Abuse Act of 1986 that permit imposition of terms of supervised release not applicable to offenses occurring prior to November 1, 1987). The Government concedes this point. We therefore vacate the five-year term of supervised release and remand to the district court for resentencing, particularly to determine whether a special parole term should be imposed, *see United States v. Smith*, 840 F.2d 886,

890 (11th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 154, 102 L.Ed.2d 125 (1988).

Silva and Delgado also received five-year terms of supervised release to follow their terms of imprisonment for the possession convictions. Neither of the appellants, however, challenged this portion of their sentences. Nevertheless, we think that the district court's error in imposing the periods of supervised release constitutes plain error. Therefore, we vacate Silva's and Delgado's terms of supervised release and remand to the district court for resentencing in light of our disposition.

## IX.

 Silva and Delgado contend that the district court abused its discretion in admitting into evidence two airline tickets that were in Escobar's possession at the time of his arrest. The tickets were issued in the names of "Henry Escobar" and "D. Sylva." Silva and Delgado argue that this evidence was not relevant, and that, even if it was relevant, the danger of unfair prejudice substantially outweighed the probative value of the tickets. We disagree. Under Rule 401, evidence of prior association is relevant to the issue of conspiracy, and we can perceive of no danger of inflaming the emotions of the jury or otherwise improperly influencing the jury from admitting the tickets into evidence. The district court did not abuse its discretion in admitting these tickets into evidence.

## X.

To summarize, we affirm the district court's judgment in all respects except with regard to the appellants' five-year terms of supervised release. We vacate that portion of the appellants' sentences and remand for further proceedings consistent with this opinion.

AFFIRMED in part, and VACATED and REMANDED in part.

**4.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.