[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10624

_____

D.C. Docket No. 4:17-cr-00131-KOB-HNJ-1


UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

ANTHONY MILES YARBROUGH,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 11, 2020)

Before BRANCH, MARCUS, Circuit Judges, and UNGARO,* District Judge.

BRANCH, Circuit Judge:

_____

* The Honorable Ursula Ungaro, United States District Judge for the Southern District of Florida, sitting by designation.

The government appeals the district court's grant of a motion to suppress evidence obtained after officers, pursuant to arrest warrants, arrested Anthony Yarbrough and his wife, secured them outside of their home, and then re-entered their home to conduct a "protective sweep" without a search warrant. The sweep revealed two shotguns which led to his charge of being a convicted felon in possession of a firearm. The government claims that the protective sweep was justified for officer safety; Yarbrough argues that the district court correctly granted his motion to suppress. We find that the totality of the circumstances demonstrates that the officer had a reasonable suspicion that a dangerous person might have been in the house and that the protective sweep was justified. Accordingly, we reverse.

## I. Background

Following the seizure of two shotguns in his home, Yarbrough was indicted on one count of possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Prior to trial, Yarbrough filed a motion to suppress, which the district court considered following an evidentiary hearing in front of a magistrate judge on August 28, 2017. The district court ultimately granted Yarbrough's motion to suppress. Because this case primarily turns on the evidence presented at the hearing and the bases for the district court's holding, we set out the essential facts in detail.

2

A. Motion to Suppress Hearing

At the motion to suppress hearing, Thomas Monroy, an investigator with the Cherokee County Sheriff's Office who was present at Yarbrough's arrest, testified to the following. He learned of Yarbrough through unverified, anonymous phone calls and e-mails indicating that there was "a lot of traffic" and "possible" drug activity at Yarbrough's house. After he ran a record check on Yarbrough, he found that Yarbrough had outstanding warrants for his arrest. Monroy attempted to arrest Yarbrough several times to no avail. On August 31, 2016, Monroy received an anonymous text message from one of Yarbrough's neighbors saying that "[Yarbrough] was home, that everybody was there," and they had seen Yarbrough in the yard. The text message did not indicate how many people would be at the house. Before heading there, Monroy asked Investigator Matt Sims to meet him at the house.

When Monroy and Sims arrived at Yarbrough's address at approximately 5:50 pm, Monroy immediately saw a pickup truck in the driveway and three men, one of whom was Yarbrough, standing around it. Monroy also testified there was a second non-police vehicle at the scene. Monroy and Sims placed all three men in handcuffs on the driveway. All three men were compliant during this process. None of the men were armed, and a *Terry* frisk revealed no contraband. One of the vehicles belonged to Yarbrough. The two other men identified the second vehicle

3

as theirs.  Monroy asked Yarbrough if his wife Shellie was in the house, since she also had warrants for her arrest, and Yarbrough affirmed she was.

As Monroy approached the house, he yelled Shellie's name and announced that he was from the sheriff's office.  Through a screen door, Monroy saw her run out of one room of the house, which he identified as the living room, into a room to his right and shut the door.  Monroy then entered the house and followed her into the room, which turned out to be a bathroom.[1]  When he asked why she ran, Shellie told him she was using the bathroom, though Monroy did not see any evidence of that.  Monroy placed her in handcuffs and walked her outside to the others.

At this point, Monroy did not know if anyone else was in the house, but he thought that someone "could possibly" still be in there.  He immediately went back inside the home.  The officer performed a protective sweep of the house, during which he noticed two shotguns in the corner of the master bedroom and a mint tin with a crystal-like substance on a dresser in the bedroom.  The sweep took less than a minute.  He took the firearms outside, cleared them, and put them in his vehicle.  He did not disturb the mint tin.  Indeed, he did not search any drawers or closed containers during this brief sweep.

---

[1] Monroy testified that, in those types of situations, people may run to a bathroom to hide or destroy evidence.

Monroy testified on cross-examination that he called an additional investigator, Officer Perea, to help him and Sims during the initial arrest. Monroy confirmed that the call log also showed that, at 5:55 pm, there was a dispatch call from him saying that suspects were in custody and that Officer Perea could slow down. Monroy further testified that, when additional officers arrived, Monroy received consent from the Yarbroughs to search their home.[2] Investigator Monroy then called a fourth officer to help aid in the search of the Yarbrough home. A dispatch call recording, admitted into evidence, indicated that Monroy notified dispatch at 6:38 pm that he had discovered two shotguns. The execution of the consent form took place at 6:40, about forty-five minutes after officers arrived at the Yarbrough home.[3]

During Monroy's cross-examination, in response to a question from the court, Monroy clarified that he had only received e-mails and phone calls regarding possible drug activity at Yarbrough's house before receiving the text message on the day in question. Upon being asked by the magistrate judge if the anonymous

_____

[2] The items seized during the second search were the Altoids tin from the bedroom, three glass pipes, scales, a clear plastic bag holding a crystal-like substance, and a false Pepsi can containing a spoon. The record does not indicate if the contents of the Altoids can were ever tested or what the "crystal-like substance" was.

[3] The timeline described above was testified to during the motion to suppress hearing in front of the magistrate judge. After the hearing and after the magistrate judge had completed his R&R, the parties entered by stipulation additional evidence originally published but not entered at the hearing—as relevant here, the dispatch calls. This new evidence formed the basis for the district court's factual findings regarding the timing of events, as detailed below.

tips indicated the number of people involved, Monroy stated that they indicated a "lot of traffic in and out."

Investigator Sims's testimony largely corroborated Officer Monroy's. After performing the protective sweep, which took "less than five minutes," Monroy exited the house with "one or two firearms." Both Yarbrough and Shellie then gave Monroy consent to search the whole house, which he did. Sims confirmed that when they performed pat downs of Yarbrough and the two other males outside the house, they did not find firearms or evidence of contraband.

One of the two men with Yarbrough at the scene testified that when the police arrived, they had their guns drawn and ordered everyone to lie on the ground. Everyone complied. This man saw the officer bring Shellie outside and then return to the house for the guns.

At the end of the hearing, the government argued that both the protective and the Yarbroughs' subsequent consent to search were valid. The defense argued that the officers lacked articulable facts sufficient to justify the search.

B. Magistrate Judge's Recommendation and District Court Order

The magistrate judge's report and recommendation ("R&R") recommended that Yarbrough's motion to suppress be denied because the protective sweep was reasonable. In the R&R, the magistrate judge made the following findings of fact. The deputies arrived at the Yarbrough residence sometime between 5:52 and 5:55

6

pm on August 31, 2016.  Monroy had Shellie in custody by 5:55 pm.  The protective sweep took approximately one minute.  The 5:55 dispatch call to Officer Perea occurred after the protective sweep.  Following the sweep, Monroy emptied the shotguns and placed them in a police vehicle the yard.  The magistrate judge also noted that Monroy had received several calls and text messages about drug activity and traffic at the Yarbroughs' residence, that Monroy approached the house to arrest Shellie on a valid arrest warrant, that Shellie ran into an unknown room after the officer called her name, and that there were two additional men in the yard.  In light of these factual findings, the magistrate concluded that the officers had a reasonable fear of someone dangerous remaining in the house and performed a valid protective sweep, given circuit precedent regarding the appropriateness of protective sweeps in the context of drug activity when police believe other parties occupy the residence.  *See United States v. Hollis*, 780 F.3d 1064, 1069 (11th Cir. 2015) (holding that protective sweep was justified where premises of arrest "was a 'drug house' that could hold 'other occupants'").  The magistrate judge summarized his rationale as follows:

> The deputies possessed information the Yarbroughs' residence exhibited "lots of" drug activity and traffic. Two other individuals, one of whom owned one of the cars at the scene, occupied the yard upon the deputies' arrival. Moreover, Mrs. Yarbrough spouse [sic] ran to a then-unknown room upon Investigator Monroy calling her name. These circumstances buttress a rational inference that other individuals may have occupied the residence and could have

7

jeopardized the safety of the officers or the public. Therefore, Investigator Monroy was justified in conducting his protective sweep.

Because the protective sweep was justified, the magistrate judge recommended denying the motion to suppress, as the shotguns were seized in plain view during the course of the sweep. The magistrate judge also recommended that the motion to suppress be denied because the Yarbroughs "voluntarily and freely" consented to a search of their home.

Yarbrough objected to the magistrate's R&R. Yarbrough argued that there were not sufficient articulable facts to justify a reasonable officer believing additional dangerous individuals could be inside the Yarbroughs' home. Yarbrough summarized what he believed problematic with the district court's recommendation in the following way:

> The Report and Recommendation misapplies the *Buie* standard in several ways. First, it finds that unverified, anonymous tips can rise to the level of reasonable suspicion, in violation of *Florida v. J.L.*, 529 U.S. 266, 268 (2000) (holding that anonymous tip that a person is carrying a gun is not sufficiently reliable to justify police officer's stop and frisk of that person). Second, it allows the government to rely on generalizations about drug dealing to meet its burden, rather than requiring individualized suspicion. Third, it cites as its primary precedent *United States v. Hollis*, 780 F.3d 1064 (11th Cir. 2015), a case with significant factual distinctions. Lastly, it fails to consider the totality of the circumstances at the time that the officers decided to search the home.

Yarbrough also argued that his consent was invalid as a product of the illegal protective sweep.

8

The district court rejected the R&R and issued an order granting the defendant's motion to suppress. The district court accepted the factual findings of the magistrate judge except in two instances. First, the court found that "Investigator Monroy could not have completed the protective sweep before making the 5:55 pm dispatch call" to Perea.[4] Second, the court found that the anonymous tips alleged "lots of traffic," which indicated "possible drug activity," but not "lots of drug activity."[5] (emphases omitted). After examining the numerous anonymous tips about a lot of traffic indicating "possible" drug activity at the Yarbrough house, the outstanding warrants for the Yarbroughs' arrests, the anonymous tip that Mr. Yarbrough and "everyone" was at the house on the day of the arrest, the number of vehicles outside the house when the police arrived, the compliant nature of the unarmed men detained outside the house, the lack of weapons or contraband on the fleeing Mrs. Yarbrough, the call made by Officer Monroy to tell the officer en route that there was no need to rush and the timing of

---

[4] The district court noted that the time of the events at the Yarbrough residence was "unclear." The court relied heavily on the dispatch calls, which showed that the investigators arrived at the Yarbrough residence at 5:53 pm. Two minutes later, the call log showed that Monroy radioed Officer Perea, the backup officer, to say "We've got the suspects in custody, you can slow down." The court found that the officers could not have arrived on scene, arrested Yarbrough, handcuffed the men in the yard, gone to the house, retrieved Shellie from the bathroom, brought her outside, and then conducted the protective sweep all before making the 5:55 call to say to Perea "you can slow down."

[5] For this finding, the court relied on Monroy's characterization of the tips as reporting "a lot of traffic in and out" of the Yarbrough home and "possible" drug activity, rather than "a lot of drug activity."

the protective sweep in relation to that call, the district court held that Monroy's

fear of danger was subjectively non-existent and objectively unreasonable. The

district court also held that the "illegal" protective sweep tainted the Yarbroughs'

consent to search. For these reasons, the district court denied the motion to

suppress.

The district court denied the government's motion for reconsideration which

requested a supplemental evidentiary hearing for the government to present

additional information on (1) when Investigator Thomas Monroy conducted the

protective sweep of Yarbough's house; (2) the accuracy of the timestamps on the

audio and dispatch logs; (3) the location of the vehicle where Investigator Monroy

placed the guns; and (4) whether Yarbrough could see the guns when he gave his

consent for the investigators to search his home. This appeal followed.

## II. Standard of Review

"Because rulings on motions to suppress involve mixed questions of fact and

law, we review the district court's factual findings for clear error, and its

application of the law to the facts *de novo*." *United States v. Bervaldi*, 226 F.3d

1256, 1262 (11th Cir. 2000). "Further, when considering a ruling on a motion to

suppress, all facts are construed in the light most favorable to the prevailing party

below." *Id*. at 1262.

## III. Discussion

The Fourth Amendment safeguards the rights of the people to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A search conducted in the absence of a search warrant is, usually, presumptively unreasonable. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). One exception to this rule is the "protective sweep," which is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.*

Officers executing a valid arrest may conduct a protective sweep. *See United States v. Yeary*, 740 F.3d 569, 579 (11th Cir. 2014) ("Law enforcement officers are permitted, in the context of a valid arrest, to conduct a protective sweep of a residence for officers' safety."). To justify a protective sweep beyond the immediate location of the arrest, officers must have reasonable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. Reasonable suspicion is an analysis of "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1990) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "Whether or not a Fourth Amendment violation has occurred depends upon objective reasonableness in light of the facts and circumstances." *United States v. Hromada*, 49 F.3d 685, 691 (11th Cir. 1995).

11

Here, the officers were executing valid arrest warrants and thus had authority to enter the Yarbroughs' home. *See Yeary*, 740 F.3d at 580. Our sole concern, then, is whether the facts known to the officers gave rise to a reasonable suspicion that a dangerous individual was located inside the house. Because our review is of the totality of the circumstances, our analysis regarding the validity of the protective sweep must take into account "the whole picture." *Sokolow*, 490 U.S. at 8; *see also Buie*, 494 U.S. at 335 (noting that a protective sweep is justified by the "circumstances" surrounding it); *United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991) (upholding a sweep based on multiple circumstances the officers encountered); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (finding a protective sweep not warranted under a totality of the circumstances). We find the facts of this case, viewed in their entirety, show that the officers had a reasonable, objective apprehension for their safety sufficient to justify a protective sweep.

First, numerous anonymous tips suggested that the house was heavily trafficked and a source of possible drug activity.[6] While the district court correctly

---

[6] The district court noted the distinction between "possible drug activity" with "lots of traffic" and "lots of drug activity" when concluding the officers did not have an objective reason to conduct a protective sweep. To the extent there is a significant difference between the "possible drug activity with lots of traffic" and "lots of drug activity," we note that we have not required police to be certain of drug activity or the extent of that activity when deciding to conduct a protective sweep. *See, e.g. Hollis*, 780 F.3d at 1069.

noted that unverified tips standing alone cannot provide reasonable suspicion, *J.L.*, 529 U.S. at 271, we have said that an officer's understanding about the situation he or she is entering can be supported by anonymous tips. For example, we have stated that "officers on the scene had reasonable cause to believe they were entering a volatile and potentially dangerous situation" in part because of a "prior report of gunshots" from an anonymous source. *United States v. Holloway*, 290 F.3d 1331, 1340 (11th Cir. 2002). Here, the tips supported an inference that the Yarbrough's home was a source of possible drug activity.[7] It is uncontroversial that drug activity can cause a rational officer to fear that (a) multiple people are involved, and (b) weapons to protect the drugs may be present. We said as much in another case upholding a protective sweep:

> The district court found that the officers suspected that the apartment was a "drug house" that could hold "other occupants." One of the officers testified that he had been told that the apartment was a "drug house," with a "high level of activity," where "people [were] in and out of the house all hours of the day or night," and that they "could expect to encounter a number of people inside." Based on that information, the officers could draw the "rational inference," *Buie*, 494 U.S. at 334, 110 S.Ct. at 1098, that there might be armed individuals inside the apartment.

---

[7] We also note that, at least to some extent, the tip that "everyone" was present at Yarbrough's house was corroborated—there were additional men and Yarbrough's wife on scene. This corroboration strengthens the weight which may be put on the anonymous tips in a totality of the circumstances review. *See Illinois v. Gates*, 462 U.S. 213, 243, 527 (1983) (finding partially corroborated tip relevant in a totality of the circumstances analysis for probable cause to issue a search warrant).

13

*Hollis*, 780 F.3d at 1069 (alterations in original). It is true, as the district court noted, that *Hollis* concerned a situation with more certain and higher-volume drug activity and traffic than at the Yarbrough residence. *See id.* But, in *Hollis*, the information about the drug activity was the *only* factor the court used to justify the protective sweep. *See id.* Here, by contrast, the officers had multiple reasons to be cautious, such as the presence of vehicles, additional men on the scene, and the errant behavior of an arrestee, which are further analyzed below.

Second, the presence of two vehicles at the residence suggested that multiple people could be present in addition to those located in the driveway with Mr. Yarbrough.[8] *See Tobin*, 923 F.2d at 1513 ("The fact that there were three vehicles on the scene coupled with [a suspect's] lying about [another suspect's] presence clearly gave rise to a reasonable belief that someone else could be hiding in the house."); *United States v. Williams,* 871 F.3d 1197, 1202 (11th Cir. 2017) (per curiam) ("The layout of the property, the close proximity of the outbuilding to the main residence, the noise indicating drug distribution activities might be occurring on the property, and the fact that three cars were parked in the driveway all suggested that there may be more people present on the premises . . . ."); *Bervaldi*,

---

[8] We note that, while the district court found the presence of the two cars made this issue a "close call," it nonetheless held that this case lacked the "additional information" required in our case law. As there is "additional information" in this case, *i.e.*, the anonymous tips, suspicious behavior of Shellie, and additional men outside, we need not decide whether the mere presence of multiple vehicles, standing alone, is ever sufficient to justify a protective sweep.

14

226 F.3d at 1267 ("The fact that vehicles were parked at the residence only buttresses the belief that persons were at the house . . . ."). The officers were already aware that additional people were on the property because of the two men standing with Yarbrough. This fact, coupled with the multiple cars and the tips about "everyone" being there, indicated a real possibility that additional people were inside the home.

A third factor supporting a reasonable suspicion that dangerous persons might be hiding in the house is that Yarbrough's wife Shellie fled to the bathroom when Officer Monroy called her name. Evasive or furtive behavior can factor into an officer's determination of reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (collecting cases where the Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *see also Tobin*, 923 F.2d at 1513 (highlighting the fact that defendant lied to the officers as suggestive that someone else could be in the house); *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000) (characterizing flight as "powerful evidence" of criminal activity when conducted in an area known to host high levels of criminal activity); *United States v. Caraballo*, 595 F.3d 1214, 1225 (11th Cir. 2010) (finding defendants' nervous demeanor and evasive movements justified a protective sweep). And we have held in another case that flight into an unknown area can be a part of the justification for a protective sweep. *See United*

*States v. Delgado*, 903 F.2d 1495, 1501, 1503 (11th Cir. 1990) (suspect running into warehouse gave officers reason to enter warehouse, arrest suspect, and perform protective sweep).  Further, Monroy testified that this evasive behavior was consistent with an attempt to destroy evidence, particularly drugs.  Shellie's flight, therefore, was additional corroborating information to the anonymous tips.

In sum, the officer in the present case knew specific and articulable facts which, viewed in the totality of the circumstances, gave rise to a reasonable suspicion justifying a protective sweep.  The multiple cars indicated multiple people on the property; the tips about the drugs indicated multiple people who may have had access to weapons; and Shellie's refusal to follow police directions indicated that, if other people were in the house, they might have likewise been non-compliant.

As a final point, we note that the sweep lasted approximately one minute and was limited in scope.  The brevity of the sweep is a point in favor of its justification.  *Hromada*, 49 F.3d at 690 ("There is no evidence that the officers opened drawers or that the sweep of the house was overextensive.  In fact, the sweep was short; it lasted only about a minute."); *see also Caraballo*, 595 F.3d at 1225 ("Further, the record does not suggest that the sweep was anything other than a limited protective sweep; [the officer] simply opened the door to the one large concealed living area of the boat where another person easily could have been

16

hiding."); *Yeary*, 740 F.3d at 580  ("Moreover, the sweep was limited in scope; it was only coincidental that one of the deputies discovered contraband in plain view while conducting the sweep.").  Here, Officer Monroy took less than a minute looking inside the Yarbroughs' home.  *See Delgado*, 903 F.2d at 1502 (finding a protective sweep proper where it lasted "no longer than necessary" and was "no more than three to five minutes").  There is no evidence in the record that the officer searched areas other than where he might reasonably find a person hiding. *Compare with United States v. Rodgers*, 924 F.2d 219, 222 (11th Cir. 1991) (where officer entered a trailer simply to collect contraband and then immediately left, search could not be upheld as a protective sweep).  Thus, the sweep was proportionate and reasonable.

Yarbrough cites *Chaves* to argue that the sweep was unjustified.  In *Chaves*, officers involved in a narcotics sting operation were tasked with arresting a drug suspect.  *See Chaves,* 169 F.3d at 689.  The officers arrested Chavez outside a warehouse, and shortly afterwards arrested two men who exited the warehouse carrying firearms.  *See id.*  We described the circumstances surrounding a subsequent search as follows:

> The door of the warehouse was locked and none of the keys taken from [the arrestees] could open the warehouse. The agents at the warehouse then waited approximately forty-five minutes outside the warehouse with [the arrestees] in custody. At this time, the agents at the warehouse, who had been joined by those arresting Chaves, conducted a warrantless entry of the warehouse, which was opened by

17

"jimmying" the door using a knife blade. During the sweep of the warehouse, which lasted approximately five to ten minutes, the agents saw boxes similar to those found in the van.

*Id.* We held that a search conducted in this manner in this situation was not a valid protective sweep. In *Chavez*, the lengthy delay between the arrests and the sweep of the warehouse made it clear that the agents saw "no immediate need to enter the warehouse to protect themselves or other persons in the area." *Chaves*, 169 F.3d at 692; *see also Rodgers*, 924 F.2d at 222 (finding a seizure of a weapon was not a protective sweep because the officer did not act as though he was conducting a protective sweep—he merely entered the home, seized guns, and stepped outside without making "any inspection of the rest of the premises"). In contrast, the officer in this case immediately swept the house following the execution of the arrest warrants.

Yarbrough also argues that *Chaves* requires the officers to demonstrate that they actually possessed a reasonable fear of dangerous individuals inside the home—something the district court relied on in its analysis.[9] We re-emphasize

---

[9] In reaching the issue of the officer's subjective belief, the district court noted that "[n]either Investigator Monroy nor Investigator Sims testified that they *actually believed* anyone other than Mrs. Yarbrough was inside the house, dangerous or not." This conclusion is not supported by the record as Monroy testified that he thought someone "could possibly" have been in the house. The magistrate judge explicitly "accept[ed] Investigator Monroy's testimony that he entered the residence briefly for the deputies' safety." The district court rejected this finding pointing to other circumstances surrounding the sweep, but notably never heard the testimony of the witness live before rejecting his credibility. *See United States v. Cofield,* 272 F.3d 1303,

that the thrust of the protective sweep analysis is objective—whether the officers had a reasonable suspicion that the area to be swept harbors an individual posing a danger to them or others on the scene. *Buie*, 494 U.S. at 334. And *Chaves* applied that standard, finding that the officers' actions, in failing to execute the sweep immediately, objectively proved that there was no danger to the officers. *See Chaves*, 169 F.3d at 692. Here, by contrast, the protective sweep was immediate— Officer Monroy escorted Shellie outside so Officer Sims could watch her and then "immediately" returned inside the house. *See United States v. Beale*, 921 F.2d 1412, 1432 (11th Cir. 1991) (finding a protective sweep valid in part because it was undertaken "immediate[ly]" after the arrest).

## IV. Conclusion

Viewing the totality of the circumstances of this case, the officer's protective sweep was justified.[10] We thus reverse the district court's order granting the motion to suppress and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

1306 (11th Cir. 2001) (noting that "generally a district court must rehear disputed testimony before rejecting a magistrate judge's credibility determinations" except in the "rare case where there is found in the transcript an articulable basis for rejecting the magistrate's original resolution of credibility and that basis is articulated by the district judge") (quotations and alterations omitted); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1250 (11th Cir. 2007).

[10] Because we find that the protective sweep was justified, we need not reach the issue of whether the Yarbroughs' consent to search was valid.

UNGARO, District Judge, dissenting:

I respectfully dissent, although I acknowledge that the facts amount to a close case.

Clearly, law enforcement officers have the authority to conduct protective sweeps of residences in conjunction with valid arrests when they have an objectively reasonable belief that the area to be swept harbors an individual posing a danger to those on the arrest scene. *See Maryland v. Buie*, 494 U.S. 325, 334-35, 110 S. Ct. 1093, 1098-99, 108 L. Ed. 2d 276 (1990).

Here, the Magistrate Judge found that the following facts amounted to reasonable suspicion: (1) Officer Monroy had received anonymous tips that there was "lots of" drug activity and traffic at the Yarborough residence; (2) when the deputies arrived, they saw two vehicles, and Yarborough and two other men in the yard; and (3) Mrs. Yarborough ran into an unknown room upon one of the officers calling her name from outside the house. But nothing at the scene of the arrests corroborated the tips, the pat-downs of the men yielded no contraband or weapons, and the officer who conducted the sweep saw and heard nothing indicating that anyone was concealed in the house when he was inside to arrest Mrs. Yarborough or at any other time prior to the sweep. Also, while the officers went to the Yarborough residence to execute arrest warrants, the record is silent with respect to why the warrants were issued.

20

In my assessment, these facts might support a subjective concern -- but not an objectively reasonable belief -- that someone dangerous remained in the house. *See United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) ("[I]n the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case."); *United States v. Delgado-Perez*, 867 F.3d 244, 254 (1st Cir. 2017) (holding that a protective sweep was unlawful because "there were not articulable facts—even when considered as a whole—supporting the presence of another individual in [the defendant's] residence"); *United States v. Gandia*, 424 F.3d 255, 264 (2d Cir. 2005) ("Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties."); *United States v. Akrawi*, 920 F.2d 418, 420 (6th Cir. 1990) (holding that a protective sweep was unreasonable, in part, because "[t]he searching officers articulated no specific basis for believing that the second floor of [the residence] harbored any individual posing a threat to the agents").

While the evidence is that the three men and Mrs. Yarborough were secured near the porch of the house and, as emphasized by the majority, Officer Monroy's re-entry was swift and his search was cursory, the only conclusion I can reach from the record is that Officer Monroy made the sweep, no doubt for officer safety,

21

because the arrest scene was proximate to the house and he had a concern that the house, like any structure, could have concealed the presence of a dangerous individual.  In other words, Officer Monroy conducted the sweep based on speculation, rather than articulable facts.  *See United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004) ("[T]here could always be a dangerous person concealed within a structure.  But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*."); *see also United States v. Serrano-Acevedo*, 892 F.3d 454, 460 (1st Cir. 2018) (holding that an assumption based on "unfounded speculation" was inadequate to establish an articulable basis to believe that a third party would be inside a home); *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996) ("Lack of information cannot provide an articulable basis upon which to justify a protective sweep.").

The District Judge rejected the Magistrate Judge's Report and Recommendation and granted the motion to suppress finding that the Government failed to prove that the protective sweep met "constitutional muster."  I would affirm.